IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DORRELL R. COULTHRUST,

                Plaintiff,

vs.                                No. CIV 06-24 RB/RHS

ALLEN COOPER and V. ALLEN,

                Defendants.

**<u>consolidated for all purposes into</u>**:

PATRICK DEMARCAD PRYCE

                Plaintiff,

                               No. CIV 06-18 JH/LFG

vs.

ALLEN COOPER and V. ALLEN,

                Defendants.

### <u>MAGISTRATE JUDGE'S ANALYSIS</u><br><u>AND RECOMMENDED DISPOSITION</u>[1]

       THIS MATTER comes before the Court on Defendant Allen Cooper's Motion to Dismiss

for Failure to Exhaust Administrative Remedies [Doc. 26], filed herein on July 11, 2006.  Plaintiffs

Patrick Demarcad Pryce ("Pryce") and Dorrell R. Coulthrust ("Coulthrust") filed their Response

---

[1] Within ten (10) days after a party is served with a copy of this legal analysis and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such analysis and recommendations. A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the analysis and recommendations.  If no objections are filed, no appellate review will be allowed.

[Doc. 29] on July 27, 2006, and Defendant filed his Reply [Doc. 33] on August 10, 2006. The motion is now fully briefed.

For the reasons given below, the Court finds that the Motion is well taken and recommends that it be granted. If the District Judge accepts this recommendation, that ruling will dispose of the entire case against both Defendants,[2] and these two consolidated cases will be dismissed without prejudice.

**Procedural Background**

Plaintiff Pryce filed his initial Prisoner's Civil Rights complaint in Civ. No. 06-18 JH/LFG on January 6, 2006. On January 9, 2006, Plaintiff Coulthrust filed a complaint in Civ. No. 06-24 RB/RHS which, in all pertinent respects, contained allegations identical to those raised by Pryce. Both Plaintiffs sought and were granted leave to amend their complaints. Pryce's Amended Complaint [Doc. 7], filed February 27, 2006, and Coulthrust's amended Complaint [Doc. 7 in Civ. No. 06-24], filed February 16, 2006, are again identical in all pertinent respects. One of the original three Defendants having been dismissed, both cases proceeded against the remaining Defendants, Allen Cooper ("Cooper") and Vicki Allen ("Allen").

On June 2, 2006, the two cases were consolidated by order of District Judge Judith Herrera [Doc. 16]. The undersigned Magistrate Judge was directed to perform the appropriate legal analysis and submit his recommended disposition in the consolidated cases to Judge Herrera, in accord with the provisions of 28 U.S.C. § 636(b)(1)(B).

On June 8, 2006, the Court ordered Defendants Allen and Cooper to submit a Martinez

---

[2]The Court notes that Defendant Vicki Allen raised the issue of Plaintiffs' failure to exhaust administrative remedies in her Motion for Summary Judgment [Doc. 32], which Motion will be mooted if this Recommended Disposition is adopted.

Report, pursuant to Martinez v Aaron, 570 F.2d 317 (10th Cir. 1978), in the consolidated cases [Doc. 20]. The Martinez Report [Doc. 31] was filed by Defendant Cooper on August 9, 2006. On the same date, Defendant Allen filed a Motion for Summary Judgment [Doc. 32], asserting *inter alia* that Plaintiffs failed to exhaust their administrative remedies. Meanwhile, on July 11, 2006, Defendant Cooper filed the present Motion to Dismiss the consolidated case, also asserting a failure to exhaust.

On September 15, 2006, the Court ordered a stay of briefing in connection with the Martinez Report and the Motion for Summary Judgment [Doc. 46], in light of possible dismissal in connection with the Motion to Dismiss currently under consideration.

As noted above, the Court agrees with Defendants that Plaintiffs have failed to exhaust their administrative remedies with respect to all claims brought in their complaints. The Recommended Disposition is that the Motion to Dismiss be granted and that the consolidated cases be dismissed without prejudice.

## Discussion

Plaintiffs are federal prisoners incarcerated at the Cibola County Correctional Center ("CCCC"), a federal prison operated by the Corrections Corporation of America ("CCA") under a contract with the Bureau of Prisons ("BOP"). Defendant Cooper was the Warden at CCCC at the times described in the complaints, and Defendant Allen is the Food Services Director of Canteen Corrections Services, a contractor providing food services at CCCC.

Plaintiffs bring this action against Defendants under 42 U.S.C. § 1983 and Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999 (1971), alleging violations of their First Amendment, due process and equal protection rights in connection

with the provision of religious meals at CCCC, and conspiracy to deprive them of their constitutional rights.

Plaintiffs state that they are foreign nationals and followers of the Rastafarian religion, and that their religious beliefs require certain dietary restrictions.  They allege that the food they are served at CCCC is not sufficient to sustain them in good health and is not in keeping with their religious dietary laws.  In particular, they allege in their Complaints and Amended Complaints that Defendants violated their constitutional rights in the following ways:

(1)  the religious meal being served at CCCC is not consistent with BOP standards for "Common Fare," or religious meals in prison;

(2) the food items Plaintiffs are served do not meet kosher standards, including standards for preparation and proper utensils;

(3) the meals consist mostly of the same vegetables served every day, and the serving sizes are not nutritionally adequate;

(4) Plaintiffs are not provided with styrofoam cups and are forced to eat from the "hot bar," or regular serving bar, which should only be utilized by the general population;

(5) Defendants hire homosexual inmates to work in the Common Fare / religious room and to prepare Plaintiffs' religious meals;

(6) Plaintiffs are served only three hot entrees every seven days whereas BOP regulations require seven hot entrees per week;

(7) Plaintiffs are not given a choice between hot and cold cereal for breakfast, in violation of BOP rules; instead they are provided hot cereal only twice a week, self-served at the hot bar;

(8) Plaintiffs are not provided with individual packs of coffee and an urn of hot water; instead they are forced to get coffee from an igloo which provides coffee to the general prison population;

(9) Plaintiffs must utilize the general population cups and beverage machines at lunch and dinner, in violation of BOP rules;

(10) the chaplain at CCCC is not "fully involved with common fare" but rather is restricted

4

to determining which inmates will receive Common Fare meals;

(11) CCCC does not have a hired rabbi to make inspection of the common fare room, assuring that it complies with Koshart standards;

(12) food preparation and cooking utensils are not segregated but are used for both common fare and the main kitchen;

(13) non-kosher food products are sometimes substituted for kosher products.

Plaintiffs seek declaratory and injunctive relief; compensatory damages in the amount of $3,000.00 per meal beginning December 28, 2004 and continuing throughout Plaintiffs' period of incarceration at CCCC, for a total of $1,000,000; and punitive damages in the amount of $100,000 against each Defendant.

Defendants contend that Plaintiffs failed to exhaust their administrative remedies with respect to some of the above claims and that their complaints must therefore be dismissed.

<u>Legal Standards on Exhaustion of Remedies</u>

The Prison Litigation Reform Act (PLRA) provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). This exhaustion requirement "applies to all prisoners seeking redress for prison circumstances or occurrences," including prisoners such as Plaintiffs in this case who are suing under <u>Bivens</u> as well as under Section 1983. <u>Porter v. Nussle</u>, 534 U.S. 516, 520, 524, 122 S. Ct. 983, 986, 988 (2002).

Section 1997e(a) requires that, before resorting to federal court with complaints about prison conditions, inmates must first seek to have these conditions remedied through the prison's

administrative grievance procedure. Furthermore, they must carry that procedure through all available appellate avenues. Failure of a plaintiff to do so mandates that the case be dismissed.

> Congress enacted the Prison Litigation Reform Act of 1995 (PLRA) . . . in the wake of a sharp rise in prisoner litigation in the federal courts . . . . The PLRA contains a variety of provisions designed to bring this litigation under control . . . . A centerpiece of PLRA's effort "to reduce the quantity . . . of prisoner suits" is an "invigorated" exhaustion provision . . . . The PLRA strengthened this exhaustion provision in several ways. Exhaustion is no longer left to the discretion of the district court, but is mandatory.

Woodford v. Ngo, __ U.S. __, 126 S. Ct. 2378, 2382 (2006). Even when the available remedies would appear to be futile at providing the kind of remedy sought, the plaintiff must nevertheless exhaust whatever administrative remedies are available. Jernigan v. Stuchell, 304 F.3d 1030, 1032 (10th Cir. 2002).

The purpose of the exhaustion requirement is to bring the alleged unsatisfactory condition to the attention of prison officials in order to give them the opportunity to satisfy the complaint and perhaps eliminate any need to invoke the judicial system, to filter out some frivolous claims, and to create an administrative record to facilitate review of cases that are ultimately brought to court. Ross v. County of Bernalillo, 365 F.3d 1181, 1184 (10th Cir. 2004).

The requirement is one of total exhaustion. The PLRA requires that all available prison grievance remedies must be exhausted as to all of the claims in Plaintiff's complaint; the presence of unexhausted claims in the complaint requires the court to dismiss the action in its entirety, without prejudice. Ross v. Bernalillo County, *supra*, at 1188-89. "If a prisoner does submit a complaint containing one or more unexhausted claims, the district court ordinarily must dismiss the entire action without prejudice." Id., at 1190.

Each specific allegation of improper prison conditions must be subjected to the administrative grievance process, in order to allow prison officials a first chance to correct the condition.  "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes," <u>Porter v. Nussle</u>, *supra*, 534 U.S. at 532; thus, a general grievance will not ordinarily suffice to exhaust a specific claim, "[n]or does a grievance exhaust administrative remedies for all future complaints of the same general type."  <u>Ross v. County of Bernalillo</u>, *supra*, at 1188.

In <u>Herrera v. County of Santa Fe</u>, 79 Fed. Appx. 422, 424 (10th Cir. 2003), the Tenth Circuit rejected an inmate's argument that earlier grievances alleging abusive treatment in the past would excuse his failure to take advantage of the prison's procedures for redressing any separate claims based on a new incident:

> The PLRA requires prisoners to exhaust administrative remedies in order to allow prisons to address specific complaints internally and thus obviate the need for litigation, to filter out some frivolous claims, and to create an administrative record that would help resolve complaints that are ultimately brought to court . . . .  These purposes would be frustrated were we to agree with Herrera that a prisoner who has previously complained of abuse somehow has a free ticket to bring similar complaints in the future based on wholly separate incidents without complying with the prison's internal grievance process.

Similarly, in <u>Palozie v. Pugh</u>, 118 Fed. Appx. 478, 480 (10th Cir. 2004), the Tenth Circuit found a failure to exhaust where the plaintiff/inmate's grievances addressed issues which did not "match with specificity the claims raised" in the complaint.

With these standards in mind, the Court turns to an examination of the grievance procedure at issue in this case and whether Plaintiffs fully exhausted that procedure before filing this lawsuit.

<u>The CCCC Grievance Procedure</u>

Grievance procedures at CCCC are set forth in Chapter 14 of the CCA Corporate and Facility Policy [Doc. 27, Ex. A (text of the Policy); Ex. B (Affidavit of Matthew Carpenter, CCCC Grievance Officer)].   Under this policy, a "grievance" is defined as "A written complaint concerning the substance or application of a written or unwritten policy or practice, any single behavior or action toward an inmate/resident by staff or other inmates, or any condition or incident within the department or institution which personally affects the inmate/resident."   The policy encourages informal resolution of complaints whenever possible.  All facilities are required to have an informal resolution process in place, and inmates are required to utilize the informal resolution process prior to submitting a formal grievance.

If the informal procedure does not resolve the situation, the inmate may file a formal grievance within seven days of the alleged incident (or of  the date when the problem became known to the inmate).  The inmate initiates the formal grievance process by completing an "Inmate/Resident Grievance Form" and placing it in the facility mail addressed to the Grievance Officer, or by giving it to a Unit Staff member who will forward it to the Grievance Officer.  The Facility Grievance Officer will conduct an investigation of the grievance and will render a decision within 15 days of receipt of the grievance.   The written decision is to be completed on Form 14-5A, a copy of which is to be provided to the inmate for his signature.

If  the inmate is unsatisfied with the decision, he may submit an appeal to the Warden/Administrator of the facility, or his/her designee, within five days of receiving the Grievance Officer's decision.  The appeal will be decided within 15 days of receipt.  Appeals are filed by completing the Request for Warden/Administrator Review portion of the grievance form and

submitting the form to the Warden.   The Warden/Administrator will review the issue and the
Grievance Officer's decision to determine whether the grievance has been appropriately addressed.
The policy notes further that, "Barring extraordinary circumstances, a grievance will be considered
settled if the decision at any step is not appealed by the inmate/resident within the given time limit."

If the inmate is dissatisfied with the Warden's decision, he must submit his appeal to the CCA
Divisional Managing Director within five days of receipt of the Warden's decision.  [Doc. 27, Ex. A].

The manual makes a distinction between ordinary grievances and those designated as "BOP
related" matters.   The latter include issues related to classification, designation, sentence
computations, reduction in sentence, removal or disallowance of Good Time, decisions involving
removal of inmate property other than contraband, or issues directly involving BOP staff.  For BOP
issues, the inmate must address all complaints through the facility's normal grievance procedure, and
the facility will respond to the extent possible.  The initial grievance is to be done on BOP Form BPO-
230 and sent to the BOP by the inmate, along with a copy of the attempt at informal resolution.
Grievances concerning BOP matters must be filed within 30 days of the date of the incident.

If the appeal concerns a BOP related matter, the inmate will be advised to appeal to the
Privatization Administrator, utilizing either form BP-230 (Regional Administrative Remedy Appeal)
or form BP-231 (Central Office Administrative Remedy Appeal).  Such appeals must be filed within
30 days of receipt of the Warden's decision.  The inmate is responsible for mailing appeals to the
BOP.   In contrast, as noted above, all other grievances are to be appealed to the CCA Divisional
Managing Director within five days of receipt of the Warden's decision.

The Court finds that the matters about which Plaintiffs submitted grievances and which form
the subject matter of their complaints and amended complaints do not fall within the categories of

"BOP related" matters, as they do not concern sentence computation, good time credits, removal of inmate property and the like.  Plaintiffs were therefore required to follow the procedures for submitting informal complaints, formal grievances and appeals from grievance decisions in accord with CCCC policy.  In particular, appeals from any decision by the Warden are to be made to the CCA Divisional Managing Director, not the BOP.

Defendants cite several claims which Plaintiffs allegedly failed to exhaust.  First, Defendants contend that, although Plaintiffs filed grievances in connection with their claim that their constitutional rights were violated by Defendants' allowing a homosexual inmate to prepare their meals, neither of the Plaintiffs filed an appeal of this claim, and it was therefore not fully exhausted.

In addition, Defendants assert that Plaintiffs failed to file grievances related to specific claims set forth in their Amended Complaints, including:  (1) failure to provide a choice of hot or cold cereal at breakfast; (2) service of coffee in a common igloo container rather than provision of separate individual packs of coffee and urn of hot water; (3) service of beverages in a common beverage machine rather than provision of separate lunch and dinner beverages; (4) failure to provide a hired rabbi to inspect the common fare room; and (5) failure to provide a hot meal seven times a week as required by the BOP common fare menu.  Finally, Defendants claim that Plaintiffs failed to file a grievance in connection with their claim that they are served the same vegetable every day.

In support of the Motion to Dismiss, Defendants attach the Affidavit of Matthew Carpenter ("Carpenter"), CCCC Grievance Officer.  [Doc. 27, Ex. B].  Carpenter states that both Pryce and Coulthrust are familiar with CCCC's grievance policy and procedures, as reflected by the numerous grievances and grievance appeals filed by both inmates.  He states further that he examined the grievance files of both inmates, and found that:  (1) neither Plaintiff appealed the decision of the

Warden regarding their claims that an alleged homosexual inmate prepared their meals, even though they had the right under the CCCC grievance policy to file an appeal; and (2) neither Plaintiff filed grievances related to the following specific claims: that they are served the same vegetable every day; that CCCC does not have a rabbi to inspect the Common Fare room; that they are forced to use general population coffee; that they are forced to use the general population beverage machine; that they are not provided with a choice of hot or cold cereal; that they are not served the proper number of hot meals per week. [Doc. 27, Ex. B., ¶¶ 6-14].

The record supports Carpenter's statements. The grievance files for both Plaintiffs were attached as an exhibit to the Martinez Report, filed by Defendants on order of the Court. [Doc. 31, Ex. F]. In addition to this exhibit, the Court examined the exhibits submitted in connection with this Motion as well as exhibits attached to Plaintiffs' complaints. Those documents establish that neither Plaintiff completed the grievance process with respect to the allegation that their constitutional rights were violated by Defendants' allowing a homosexual inmate to prepare their food. In addition, it appears that they did not properly complete the grievance process with respect to any of their other claims.

<u>Plaintiff Pryce's Grievance History</u>

The record indicates that in July 2005, Plaintiff Pryce submitted two informal complaints, followed up with a formal grievance, regarding his allegation that the religious or "Common Fare" meals served at CCCC are not the same as the kosher Common Fare meals served in BOP prisons.

Pryce complained, specifically, that the kosher meal preparation techniques, utensils and products were not being used for the Common Fare meals. He also complained that he was forced to eat from the "hot bar" used by the general prison population, in order to supplement the inadequate

religious meals, and that he was not provided with styrofoam cups.  He demanded $1 million in compensation for these deprivations.

Prison officials responded to Pryce's complaint by stating that CCCC is obligated by its contract with BOP to provide religious meals, and that the facility attempts to provide food items typically included in the Common Fare menu.  The responding official noted that a review would be conducted, with the Common Fare menu in mind, to determine whether the CCCC menu might be further revised.

Finding this response unsatisfactory, Pryce filed a formal grievance on August 3, 2005.  The Grievance Officer declined to take any action on the grievance, stating that the religious menu served at CCCC in fact meets Pryce's religious dietary needs.  Pryce appealed to Warden on August 17, 2005.  The Warden concurred with the Grievance Officer's decisions, stating that the Common Fare meals served at CCCC meet all dietary requirements and have been reviewed and approved by a licensed dietitian.  On August 22, 2005, the grievance was noted to be "not substantiated" and was returned with no action.  No comment was made on this decision with respect to the proper procedures for filing an appeal from the Warden's decision.

Pryce then appealed the Warden's decision to the BOP, using form BP-230, headed "Regional Administrative Remedy Appeal."  The Administrative Remedy Coordinator of the BOP Privatization Management Branch rejected the appeal on September 2, 2005, with the remark that "This issue is not appealable to the BOP.  You must use the grievance procedure at your facility."

Instead of following this directive, Pryce tried again to appeal this grievance to the BOP, this time utilizing form BP-231 headed "Central Office Administrative Remedy Appeal."  On October 5, the Administrative Remedy Coordinator at the BOP Central Office rejected this appeal as well,

remarking, "We concur with the Privatization Management Branch's rationale for rejecting your appeal. This needs to be addressed with CCA."

In spite of this second notification that he sent his appeal to the wrong place, Pryce did not make any further attempt to appeal this grievance nor to determine where the appeal should be sent. Furthermore, the record does not indicate that Pryce made any effort to determine which issues are appealable to the BOP and which must be appealed to the CCA Divisional Managing Director. These matters are set forth in the CCA Policy Manual, and there is nothing to indicate that Pryce would not have been directed to that Manual if he had made an attempt to further investigate the grievance appeal process.

Prior to the "Common Fare" complaint, Pryce filed an earlier grievance complaining about failure to provide a religious leader of the Rastafarian faith and a 24-hour-a-day chapel for worship. That grievance was denied, and the appeal was turned down by the BOP for the same reason given with respect to Pryce's grievance on the food issue; that is, the issue he was appealing was not appropriately sent to the BOP. This earlier rejection should have put Pryce on notice that certain issues were appropriate for resolution by the BOP and others were not, and that different appellate avenues existed for the two types of complaints. There is no allegation or evidence that he did not have adequate time or ability to investigate the rules.

The Court notes that in connection with this earlier grievance rejection, the Warden (or his designee; the signature is not legible) instructed Pryce that if he disagreed with the decision, he should address his appeal to the Administrator, PMB (that is, the Privatization Management Branch), using BP form 230. The CCA Corporate and Facility Policy manual indicates that this advice was erroneous; the correct avenue for appealing the chapel request was to file an appeal with the CCA

13

Divisional Managing Director, as the request did not involve BOP issues such as sentence reduction or good time credits. However, when Pryce did appeal his chapel request to the BOP, he learned that that appeal route was inappropriate. There is no indication that Pryce took any further steps to determine the proper route. While the Warden's statement may have been misleading, that does not absolve Pryce of the obligation to determine the proper steps to follow and to abide by the requirements of the prison grievance policy. The earlier error should have put Pryce on notice, for later grievances, that a different procedure might be necessary.

This is not a mere technicality. If Pryce had appealed his chapel request or his food complaint to the proper local authority, there is a chance that CCCC would have granted his requests, at least to some extent, and the necessity for filing a lawsuit would have been eliminated.

The BOP's two rejections of Pryce's chapel grievance were dated August 17, 2005 and September 19, 2005. The BOP's two rejections of his "Common Fare" grievance were dated September 2, 2005 and October 5, 2005. Thus, Pryce had been notified four times by the BOP that he was utilizing an incorrect method for appealing non-BOP issues, by the time he filed his grievance regarding homosexuals serving his food. That grievance was filed in December 2005.

The grievance stated that the prison was violating Pryce's religious rights by allowing a homosexual inmate to prepare his religious diet. He demanded that homosexual inmates be moved from the Common Fare room and that someone else, presumably non-homosexual, be assigned to prepare his meals. The request was rejected by the Grievance Officer on December 20, 2005. He wrote that there was no validity to Pryce's claim regarding the sexual orientation of food preparers, and stated that no investigation would be conducted as long as the food workers were following the rules of the institution.

14

Pryce then appealed the grievance to the Warden, writing, "I am a Rastafarian, and according to my religion and the tenets of my religion, it is an abomination to associate, eat from, or have anything to do with homosexuals.  Ask this individual if he's a Homo."

The Warden rejected the appeal on December 30, 2005, stating that he concurred with the Grievance Officer's decision.  Pryce signed the document on January 4, 2006, indicating that he had received the Warden's decision.  He did not appeal the Warden's decision; instead, two days after receipt of the decision, he filed the present lawsuit.

Plaintiff Coulthrust's Grievance History

Plaintiff Coulthrust's grievance file is similar to Pryce's.  He made the same complaint, in informal Requests to Staff, regarding the failure of CCCC to serve the same Common Fare menu that is served in other BOP facilities.  The attempted informal resolution did not satisfy him and on August 5, 2006, Coulthrust filed a formal grievance, stating that he had not been provided with proof that the BOP approved CCCC's Common Fare menu, nor was there any proof that the canteen's kosher practices had been certified by an orthodox rabbinical organization.

The Grievance Officer rejected the grievance, stating that the Common Fare menu had been reviewed and approved by CCA, the Canteen, and a dietitian.  Coulthrust appealed to the Warden, who rejected the appeal on August 14, 2005.

Coulthrust appealed that decision to the BOP, as he was advised to do by the Warden.  As noted above, this was incorrect advice.  On August 18, 2005, Coulthrust filed a "Regional Administrative Remedy Appeal" on Form BP-230.  The Privatization Branch rejected the appeal on September 2, 2005 on grounds "this issue is not appealable to the BOP.  You must use the grievance procedures at your facility."  As was the case with Pryce, Coulthrust did not follow the directive to

15

utilize the CCA appeal route but rather made a second attempt to appeal to the BOP, this time filing

a Central Office Administrative Remedy Appeal."   On October 6, 20005, this appeal was rejected by

the BOP Central Office, which concurred with the Privatization Branch's conclusion and directed

Coulthrust to "address his issues with CCA."   There is no record that Coulthrust attempted to file a

further appeal of this issue, nor that he made any effort to determine the correct place for such filing.

Coulthrust also made informal resolution requests regarding his complaint about homosexuals

working in the Common Fare room.  On October 31, 2005, he filed a Request to Staff form, stating

that a homosexual inmate was recently hired as a prep cook in the Common Fare room and that this

violated his Rastafarian beliefs.  The request for informal resolution was rejected on the ground that

the institution cannot discriminate against anyone based on race, religion, culture, country of origin,

or sexual preference.  In an undated document titled "Attachment," which may be part of the informal

resolution process or may be part of the formal grievance, Coulthrust stated further that "it is an insult

and religious violation to my religion" to allow a homosexual to prepare his food, and that:

> the Common Fare room, as with Koshart laws and prominent religions
> are not equal opportunity avenues for one who is looking for
> acceptance of their homosexual practices.  This is not a matter of
> discrimination.  This is a matter of religious violation on part of
> Canteen and CCA Cibola by allowing a known homosexual to
> infiltrate and make unclean the fundamental tenets of sincere held
> religious beliefs.

Coulthrust's formal grievance on this issue was submitted on November 24, 2005, asking that

the "known homosexual" not be allowed to work in the Common Fare room.  The grievance was

rejected by the Grievance Officer on grounds that any inmate has the right to work at any job in the

facility, and the situation complained of "does not impact your religious beliefs."  Coulthrust appealed

to the Warden who, on December 19, 2005, notified Coulthrust that he declined to take any action

on the grievance as long as the food workers were following the rules of the institution.

Coulthrust signed the grievance form, indicating that he had received it, on December 20, 2005.  He did not file an appeal from this decision; instead, he filed his lawsuit Civ. No. 06-24, on January 9, 2006.  As noted above, his complaint is identical to Pryce's in Civ. No. 06-18, and the two cases have been consolidated.

Plaintiffs Failed to Exhaust Their Administrative Remedies

Defendants now argue that, because both Plaintiffs failed to appeal the decision on their complaints regarding homosexual food preparers, they therefore failed to completely exhaust their administrative remedies with respect to all claims in the case and the Court is thus compelled to dismiss the lawsuit.  The argument is well taken.

Both Pryce and Coulthrust were advised by the Warden that, if they were dissatisfied with the Warden's decision on the homosexual food preparer issue, they could appeal to the BOP Administrator, Privatization Management Branch.  As noted above, this was incorrect advice and did not comport with the grievance procedures set out in the CCCC policy manual.  While the Court does not condone any misinformation given to inmates with respect to their rights to grieve and appeal issues bearing on conditions of confinement, the misinformation in this case does not excuse Plaintiffs' failure to follow the proper appellate course and fully exhaust their remedies.  "[T]he mandatory exhaustion requirement cannot be excused on the ground that the detainee was not informed of the grievance procedure."  Turrietta v. Barreras, 91 Fed. Appx. 640, 642 (10th Cir. 2004);  Yousef v. Reno, 254 F.3d 1214, 1221 (10th Cir. 2001).

Neither Pryce nor Coulthrust filed an appeal of any sort after their grievances with respect to homosexual food workers were rejected by the Warden.  They argue that this failure should be

17

excused, as their prior appeals to the BOP were rejected on grounds that certain issues are not appealable to the BOP.  It appears that Plaintiffs are assuming that matters which are not appealable to the BOP need not be appealed at all.  However, the CCA policy manual states that matters not appealable to the BOP must be appealed to the CCA Divisional Managing Director.  In addition, both of these Plaintiffs were personally advised by the BOP, in several different notices rejecting their attempted appeals, that matters which are not appealable to the BOP must be taken up with CCA.  In spite of these notices, Plaintiffs either continued in their attempts to appeal inappropriate matters to the BOP or, in the case of the grievances based on homosexual food preparers, decided not to appeal the adverse decision to the BOP, CCA, or anyone else.

While it appears that Plaintiffs were advised by the Warden to file their appeals with the wrong agency, there is nothing on the record to indicate that these misdirections were intentional or malicious and, in any event, Plaintiffs were eventually given proper direction by the BOP.  Once Plainitffs were notified that they could complete the appellate process with CCA, they chose not to do so.  They state in their briefing on this Motion that they felt it would be futile, as the BOP had rejected their earlier attempts to appeal.  The subjective belief that pursuit of a particular remedy would be futile does not excuse the requirement of full exhaustion.  Turrietta v. Barreras, *supra*, at 642; Jernigan v. Stuchell, *supra*, at 1032.

The Supreme Court recently reaffirmed the importance of exhaustion of administrative remedies in PLRA cases, and emphasized the necessity for *proper* exhaustion:

> Requiring proper exhaustion . . . gives prisoners an effective incentive to make full use of the prison grievance process and accordingly provides prisons with a fair opportunity to correct their own errors . . . . Proper exhaustion reduces the quantity of prisoner suits because some prisoners are successful in the administrative process, and others

18

>       are persuaded by the proceedings not to file an action in federal court.
>       Finally, proper exhaustion improves the quality of those prisoner suits
>       that are eventually filed because proper exhaustion often results in the
>       creation of an administrative record that is helpful to the court.

Woodford v. Ngo, *supra*, 126 S. Ct. at 2387-88.

Given this strict approach to the exhaustion requirement, as well as the mandatory nature of the exhaustion requirement, the Court has no option but to grant the Motion to Dismiss based on Plaintiffs' failure to exhaust their grievances concerning homosexual food servers. In addition, although Defendants do not contend that a failure to exhaust occurred in connection with Plaintiffs' grievances concerning CCCC's alleged failure to abide by the BOP Common Fare menu, the Court has not been presented with evidence that Plaintiffs completed a proper appeal with respect to this claim, either. It is Plaintiffs' burden to establish exhaustion, Palozie v. Pugh, *supra*; Steele v. Federal Bureau of Prisons, 355 F.3d 1204, 1210 (10th Cir. 2003), and they have failed to do so in this case.

It appears, as well, that several of the specific complaints raised in the Amended Complaints were never grieved at all. Plaintiffs assert that the specific matters raised in the complaint -- such as service of the same vegetable each day, service of only three hot entrees per week, provision of coffee urns and beverage machines which are also used by the general population, etc. – are simply explanations of "the manner which plaintiffs's constitutional rights were violated," rather than separate, grieveable claims.

The Court does not agree. The purpose of the grievance process, and the exhaustion requirement, is to give prison official notice of specific problems so that they may attempt to resolve them without resort to litigation. By failing to grieve these specific issues, Plaintiffs deprived prison officials of the opportunity to correct the problems. There is nothing on the record to establish that

prison officials should have been aware that service of the same vegetable every day or failure to provide styrofoam cups, for example, violated Plaintiffs' religious beliefs.

While prison officials might be expected to know, for instance, that an observant Muslim or Jewish inmate will not eat pork, the dietary restrictions of Rastafarianism, in contrast, are not generally matters of common knowledge in United States prisons.  Indeed, it appears that these restrictions are not well defined in general and may vary from group to group, or even from person to person.  *Cf.* Benjamin v. Coughlin, 905 F.2d 571-579-80 (2d Cir. 1990):

> Rastafarians observe a diet called Ital, which "symbolizes a belief in life and an avoidance of symbols of death" . . . . The exact nature of the Ital diet varies among individuals and Rastafarian sects . . . . Plaintiffs now seek a "vegetarian diet with foodstuffs that their faith permits them to eat." They also contend that a kosher diet would "substantially meet their religious need." Notwithstanding this attempted clarification, the varied nature of the Ital diet raises questions as to the foodstuffs that will satisfy their request . . . . We remain uncertain as to the exact nature of the dietary request, which has varied during the course of this litigation. Based on the present state of the record, we find that the dietary claim must be rejected because plaintiffs have failed to clearly define the claim or to make the evidentiary showing required to establish any constitutional dietary claim.

It may be that prison officials need to be better educated about the dietary needs of inmates who adhere to the Rastafarian religion.  A thoughtful, respectful and realistic grievance might serve to provide that education.  The filing of such a grievance and pursuit of it through the appellate process if necessary would, at any rate, ensure that deficiencies are brought to the attention of prison officials so they have an opportunity to remedy specific problems.  This is not to say that all of the particular complaints raised by Plaintiffs, including such things as their demand for a choice between hot and cold cereal, separate coffee urns, and a different vegetable every day, would rise to the level

of constitutional violations.   But the Court cannot reach that issue in the absence of a full administrative record.   Failure to grieve these specific matters is fatal to Plaintiffs' complaint.

### **Recommended Disposition**

That Defendant's Motion to Dismiss for Failure to Exhaust Administrative Remedies [Doc. 26] be granted and that these consolidated cases be dismissed without prejudice.   It is further recommended that Defendant Allen's Motion for Summary Judgment [Doc. 32], and any other pending motions, be denied as moot.

_____
Lorenzo F. Garcia
Chief United States Magistrate Judge

21